**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**5:26-cv-00590-D-RN**

| | | |
|---|---|---|
| SCOTT LASSITER,<br><br>Plaintiff,<br><br>v.<br><br>WAKE COUNTY BOARD OF EDUCATION,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **FIRST AMENDED COMPLAINT**<br>(Jury Trial Demanded) |

NOW COMES Plaintiff Scott Lassiter, by and through undersigned counsel, and alleges against Defendant Wake County Board of Education as follows:

**PARTIES**

1. Plaintiff is a resident of Wake County, North Carolina.

2. WCBOE is a governmental education entity headquartered in Cary, North Carolina.

**JURISDICTION AND VENUE**

3. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because Plaintiff asserts a claim under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. This Court has supplemental jurisdiction over the related North Carolina claims under 28 U.S.C. § 1367.

4. Venue is proper in this District and Division under 28 U.S.C. § 1391 because Defendant resides here and a substantial part of the events occurred in Wake County. This action was removed from Wake County Superior Court on August 19, 2026.

## ALLEGATIONS

5. Plaintiff was employed by Defendant as an Assistant Principal in the Wake County Public Schools (WCPSS) for a term commencing on July 1, 2021 and ending on June 30, 2025. See Exhibit "A".

6. Plaintiff entered the 2024-2025 school year with an expectation of continued employment with WCPSS beyond the expiration of his existing term based upon his professional record, qualifications, prior service, documented advancement trajectory, and absence of prior discipline indicating that his employment was in jeopardy. More immediately, Plaintiff possessed an existing written employment term extending through June 30, 2025. His WCPSS employment instead ended effective November 5, 2024, approximately eight months before that term expired, after he was pressured to resign under threat that senior WCPSS officials would otherwise recommend his termination publicly to the Board of Education.

7. North Carolina law separately protected Plaintiff's existing contractual term as a school administrator. N.C. Gen. Stat. § 115C-287.1(c) provides that the term of a school administrator's employment shall be stated in a written contract and shall not be dismissed or demoted during that term except for the grounds by which a teacher may be dismissed or demoted as set out in N.C. Gen. Stat. § 115C-325.4. The same statutory framework provides that a decision not to offer a new, renewed, or extended administrator contract may not be arbitrary, capricious, discriminatory, personal, political, or otherwise prohibited by State or federal law. N.C. Gen. Stat. § 115C-287.1(d). Plaintiff alleges that these protections, together with his written contract, gave him a legitimate claim of entitlement to continued employment through the unexpired contractual term and reinforced his reasonable expectation that political activity itself would not terminate his WCPSS career.

8. WCPSS's own adopted policy likewise expressly contemplated political participation by its employees. Wake County Board of Education Policy 7720, Employee Political Activities, provides that employment or volunteer service with the school system does not preclude an individual from participating in political activities, including campaigning for candidates or issues and running for or serving in public office, subject to stated limitations concerning work time, school-system resources, use of official position, and compliance with law and Board policy. Plaintiff alleges that he complied with those limitations and did not use his WCPSS position, work time, or school-system resources to conduct his campaign.

9. Against that contractual, statutory, and policy backdrop, Plaintiff alleges that senior WCPSS officials nevertheless came to treat his candidacy, political associations, and related protected speech as incompatible with his continued employment. Plaintiff further alleges that the premature loss of his existing contractual employment deprived him of compensation, benefits, and employment protections associated with the remainder of that term and occurred without the constitutionally adequate notice and opportunity to contest an involuntary deprivation that would have accompanied termination for cause.

10. On February 8, 2018, Plaintiff was appointed Assistant Principal at Connections Academy, a WCPSS alternative middle school serving students subject to serious disciplinary action from their base WCPSS school that would have otherwise resulted in long-term suspension and served with distinction and complete loyalty to the school and its mission. Prior to that appointment, he served with distinction as a teacher and administrator in WCPSS since 2010 aside from a one-year stint in Johnston County Public Schools.

11. On May 22, 2024 Plaintiff and his colleague, Behavior Support Teacher Anthony Dickerson ("BST" or "BST Dickerson") intervened in a physical altercation in which a student

was assaulting another student and repeatedly threatening to kill her (hereinafter referred to as the "May 22 incident").

12. Consistent with their training and responsibility to keep the school, its students, and staff safe, Lassiter and the BST restrained the threatening student, attempted to deescalate the student to no avail, and ultimately removed the student from the area where the intended target and other students and staff were located and called for law-enforcement assistance through 911.

13. WCPSS's own interviews also corroborate that taking an escalated student away from other students and, when necessary, outside the building was not an unprecedented practice at Connections Academy. Data Manager Kelly Morrell told investigators that it was normal for escalated students to go outside and that staff would walk them around the premises. Special Education Teacher Sam Gharbo told investigators that some students will not deescalate and have to be taken outside and that, once he saw the student outside, he regarded the situation as diffused. Lead Secretary Wanda Chavis told investigators that the threatening student from the May 22 incident was not the first to be escorted outside and that the decision depended upon the threat to the student or others. School Counselor Kenneth Cormier told investigators that students had been taken outside in the past, that staff gave students an opportunity to calm down there, and that staff would call parents or 911 while the student was outside.

14. Even the threatening student's own interview contained admissions consistent with a rapidly escalating safety event. The threatening student told investigators they were going to the other student's classroom after being told that the student was 'ducking a fade' (slang for running away from a physical fight or being "chicken"), telling the other student to come out of the classroom, later 'resisting' as staff escorted the student, and kicking and pulling away because the student did not want staff touching them.

15. Plaintiff's assessment of the safety threat on May 22 was also informed by his prior firsthand experience with the threatening student's history of serious aggressive and violent behavior. Before May 22, Plaintiff had personally responded to prior incidents involving the threatening student, including a significant physical altercation aboard a WCPSS school bus that was captured on the bus's video-surveillance system. Following that incident, Plaintiff permanently suspended the threatening student from bus transportation because of the seriousness of the conduct depicted on the recording. WCPSS therefore possessed contemporaneous institutional records, including video evidence, documenting the threatening student's prior involvement in serious physical aggression.

16. On May 22, the threatening student, who had just returned from a suspension for engaging in the aforementioned high intensity violent fight on the bus, was suspended from school by Plaintiff for previously described attempted assault on a student. Later that day, the threatening student's adult brother, who, unbeknownst to Plaintiff, was a registered sex offender, was brought to the school by the mother of both individuals. The brother attempted to force entry into the school through multiple entry points despite multiple lawful commands by law enforcement on the scene to stop. His intention to harm Plaintiff because of Plaintiff's actions in preventing the fight was made clear in the presence of law enforcement. When Plaintiff was invited outside to attempt to calm the mother and brother, in the presence of law enforcement, the brother ripped his shirt off and charged at him full speed attempting to assault Plaintiff, requiring police to handcuff and detain him. Plaintiff immediately reported the full incident in writing and by telephone to the area superintendent, including the student altercation, the later attempted attack, and the continuing safety risks at Connections Academy. Those reports were consistent with Plaintiff's prior warnings about school safety, staff safety, and inadequate

security support. Plaintiff raised those concerns both in his official capacity and, as set forth below, in his capacity as a concerned citizen and candidate for political office.

17. Plaintiff's written report on the day of the incident (May 22) likewise framed the event as a safety intervention, not as punishment. In an email sent that morning to the area superintendent and principal, Plaintiff advised that the threatening student's mother was upset about her child being restrained "in the course of breaking up a fight". (See Exhibit "B") The accompanying school incident report recorded that the threatening student attempted to force entry into a classroom to engage another student in a physical altercation, continued making threats, repeatedly attempted to regain access to the other student, and was escorted outside because staff believed the threatening student presented a continuing safety threat. Plaintiff also documented that police were called. Defendant therefore possessed Plaintiff's contemporaneous account of the safety rationale from the date of the event itself.

18. More significantly, on June 5, 2024, only fourteen days after the May 22 incident, Principal Janet Perkins (sometimes referred to as Janet Roberts in Exhibits/documentation prior to her most recent marriage) completed Plaintiff's 2023-2024 summary evaluation and rated him Accomplished in each of the seven North Carolina school-executive standards, including Strategic Leadership, Instructional Leadership, Cultural Leadership, Human Resource Leadership, Managerial Leadership, External Development Leadership, and Micro-political Leadership. The evaluation specifically credited Plaintiff with conflict management and resolution between staff and students, meeting school expectations for students and staff, and ensuring that Connections Academy met WCPSS standards. Perkins described Plaintiff as a "true change agent". The contemporaneous evaluation did not identify the May 22 intervention as misconduct or recommend corrective action concerning it.

19. Superintendent Robert Taylor and Chief of Staff Clinton Robinson knew about the May 22 incident at least by July 30, 2024 when they joined Plaintiff for a golf outing and discussed it without considering Plaintiff's intervention in an attempt to protect life as misconduct. Rather, they expressed appreciation for his willingness to take appropriate, professional and swift action to protect students and staff under his care while remarking about incidents they both had experienced in their early careers in education.

20. Approximately three months after the May 22, incident, in late August of 2024 while Plaintiff's hotly contested and extremely close state Senate campaign was in the pivotal final weeks and just before early voting began, a sheriff's deputy directly served a subpoena to Plaintiff seeking the surveillance footage of the May incident requested by the Public Defender assigned to a case involving the threatening student's brother who was later indicted without Plaintiff's knowledge by a Wake County Grand Jury for his involvement in the May 22 incident.

21. For three and a half months after the May 22 incident, Plaintiff heard nothing from Defendant or its agents and he continued to serve as Assistant Principal of Connections Academy without incident until on or about September 5, 2024, when he received a letter from Anthony Muttillo, Assistant Superintendent for Human Resources, advising him that he was being immediately suspended. See Exhibit "C". The letter stated that Muttillo believed that "cause may exist for [his] dismissal" while conceding that additional investigation was necessary, and asserted that the action was being taken because of an alleged negative physical interaction with a student. The letter did not disclose that a NC Department of Public Instruction ("DPI") misconduct report would be made within days or that a subsequent report would be submitted after Plaintiff's resignation. Defendant has previously and since used suspension letters in comparable licensed-educator misconduct matters that expressly advise employees that the

circumstances require reporting to the State Board of Education or DPI. Plaintiff's September 5 suspension letter contained no such notice.

22. Senior Director of Employee Relations Jerry Griffith gave Plaintiff the September 5 suspension letter at an in-person meeting at WCPSS's central office, which was signed by Muttillo. Muttillo declined to meet with Plaintiff when he asked if he could see him. Plaintiff was instructed by Griffith that the matter was highly confidential and that he was only entitled to discuss the matter with Superintendent Taylor though the suspension letter carbon copied all members of the WCPSS Board of Education. The letter had been prepared before Plaintiff had been afforded an opportunity to explain the incident to Mr. Griffith. No mention of the DPI licensure-reporting process was made during this meeting.

23. BST Dickerson, involved in the same May 22 incident, was also suspended with pay. Dickerson initiated the physical contact with the threatening student and tackled her to the floor. Dickerson has stated that the threatening student's subsequent fall upon being escorted out of the door was accidental and that he does not believe Plaintiff intentionally pushed her. Defendant's later DPI reports nevertheless described the event as Plaintiff and Dickerson having pushed the threatening student out of a building door, causing her to fall. Immediately after Plaintiff was coerced to resign, Defendant returned Dickerson to work without further discipline, and Dickerson remains employed by Defendant in the same role at Connections Academy. See Dickerson Declaration attached hereto as Exhibit "D".

24. The Licensed Educator Misconduct Reporting Form used by Defendant on September 13, 2024 expressly instructed public-school administrators that allegations involving physical abuse of a student were to be reported "within 5 calendar days" of a licensee's dismissal, "suspension, with or without pay", or acceptance of resignation. The same report identified

Plaintiff's status as "suspended WITH pay due to the suspicion that the employee may have engaged in professional misconduct". Defendant therefore selected a reporting form and a reporting theory that treated Plaintiff's September 5 paid suspension notification as a triggering event, yet the initial report was not made until September 13, 2024. See Exhibit "E".

25. The September 13 report was completed by Perry Aaron, Senior HR Administrator for WCPSS. Its narrative reduced a protracted student-safety event to an allegation that Plaintiff and another employee pushed a student out of a building door and that Plaintiff threw the student's shoe in the student's direction. Although the form directed the reporting entity to provide as much information and evidence as possible, every listed supporting-document field was marked "N/A"; the form stated that the WCPSS investigation remained ongoing; and Defendant answered "No" when asked whether it had any concern about DPI sharing the report and documents with Plaintiff. Plaintiff nevertheless was not told that the report even existed. See Exhibit "E".

26. The morning after the suspension notification, September 6, 2024, Plaintiff requested to meet with, and subsequently met with, Defendant's Employee Relations Director, Kendra Hill ("Hill") in person at WCPSS central office and explicitly explained the political circumstances of the suspension and the public-relations nightmare that would likely ensue due to what he perceived as a forthcoming leak of the suspension through agents of Defendant or directly through Defendant's elected Board member(s). Hill, a known Democratic Party operative, stated, in substance, that those circumstances were why she would never run for elected office and ended the meeting.

27. At 4:04 PM on Friday, September 27, 2024, Plaintiff was contacted by Hill from her personal cell phone to his. Over the course of the documented 10-minute call, Hill warned

Plaintiff that he should take the weekend and consider resigning; if he resigned, she represented that the matter would be over, but if he did not resign she would recommend termination publicly to the Board. This threat and the timing of the employment action were motivated by Defendant officials' knowledge of his active State Senate candidacy in a vigorously challenged election between Plaintiff (a Republican) and Democratic State Senator Lisa Grafstein, and the foreseeable effect that a public termination proceeding would have on his campaign and professional reputation. Additionally, Defendant and its agent knew and fully appreciated the media circus that a public recommendation for termination against Plaintiff, at that specific time, would create and how it could tip the scale of an otherwise statistical dead-heat of an electoral contest.

28. At the time Hill communicated directly with Plaintiff concerning his resignation and threatened recommendation for termination, Hill was a licensed North Carolina attorney and former judicial officer, and she knew that Plaintiff was represented by counsel concerning the employment matter. Upon information and belief, Hill was acting on behalf of WCPSS in a legal capacity in connection with Plaintiff's suspension and proposed separation.

29. Notwithstanding her knowledge that Plaintiff was represented by legal counsel, Hill communicated directly and solely with Plaintiff.

30. A former WCPSS central-office communications employee with firsthand knowledge of the operation of Defendant's Communications Department has declared that it was her sense that Plaintiff was generally disliked because of his political affiliation and outspokenness on school security issues. Moreover, this employee's distinct impression was that WCPSS officials were firmly supporting Plaintiff's opponent in the State Senate race referred to in the meetings as "Lisa G." From what this employee overheard it was her impression that Plaintiff was singled

out for punishment for his actions in the May 22 student incident mostly because of his political race and school security issues. This employee also did not witness the kind of punishment administered to Plaintiff in other instances and never heard of a report to DPI for misconduct for actions similar to those undertaken by Plaintiff on May 22. See Exhibit "F".

31. To avoid intense media attention and scrutiny flowing from any alleged misconduct report, Plaintiff agreed to enter into a Confidential Personnel Agreement ("CPA") executed on October 6, 2024, by which he "voluntarily" agreed to resign from the WCPSS. See Exhibit "G".

32. The resignation was not the product of a free and informed choice. Plaintiff was required to choose, during the final weeks of a "bare knuckles" political campaign, between resigning on Defendant's demanded terms or facing a threatened public recommendation for termination, while Defendant withheld the existing September 13 DPI report and the continuation of a separate licensure process in November of 2024. Those circumstances deprived Plaintiff of the information and practical freedom necessary to make a genuinely voluntary surrender of his contractual and constitutional rights.

33. Defendant knew that the motivating reasons for Plaintiff entering into the CPA were to fully and completely resolve the alleged misconduct matter on a <u>confidential basis</u>, to halt media damage to his campaign and to preserve and protect his good name and reputation as well as future employment opportunities in education.

34. Defendant also knew that, had it revealed to Plaintiff that it had already reported the May 22 incident to DPI and intended to continue or supplement that report, Plaintiff would not have agreed to negotiate or enter into the CPA. Plaintiff alleges that Defendant purposefully withheld the September 13 report to DPI in order to induce an agreement adverse to Plaintiff's interests.

35. The CPA by its very title was to be confidential and is replete with express provisions setting out the confidential nature of the agreement between the parties. In a letter authored by Anita W. Alpenfels, Interim Senior Director of Employee Relations with WCPSS, on November 18, 2024, to the mother of the student responsible for violent conduct referenced in the May 22 incident, it was once again reiterated that the review of the student altercation was "confidential". See Exhibit "H".

36. Plaintiff, in his negotiations with Defendant and the resultant CPA had every expectation that the May 22 student altercation matter would be and was totally resolved and that the investigatory review and the CPA would remain confidential.

37. Neither Plaintiff nor either of the two attorneys advising him knew during the negotiations or execution of the CPA that Defendant had made, or intended to make or supplement, a report to DPI. Plaintiff understood Hill's representation that "the matter would be all over" to mean that resignation would finally resolve the matter, subject only to obligations that were actually disclosed.

38. Defendant suspended Plaintiff with pay on September 5, 2024. N.C.G.S. § 115C-326.20(b) imposed a mandatory reporting obligation for qualifying licensed-educator misconduct resulting in specified employment action. Critically, the Licensed Educator Misconduct Reporting Form that Defendant actually used in September 2024 expressly instructed a Public School Unit administrator that qualifying physical abuse of a student must be reported within five calendar days of the licensee's "dismissal, suspension, with or without pay, or acceptance of the licensee's resignation". Defendant's own completed form identified Plaintiff as suspended WITH pay. Thus, under the reporting framework Defendant itself invoked, the five-calendar-day period following the September 5 suspension expired on September 10, 2024. See Exhibit "E".

39. Unbeknownst to Plaintiff, Defendant submitted an initial report concerning the May 22, incident to the DPI on September 13, 2024, eight calendar days after Plaintiff's September 5 suspension. Thus, if Defendant believed on September 5 that Plaintiff's alleged conduct constituted qualifying misconduct requiring a report under the statute and rule, the reporting obligation arose at that time, and the September 13 report itself was submitted outside the prescribed five-calendar-day reporting period.

40. In September 2024, Defendant entered into negotiations concerning Plaintiff's separation from employment while Plaintiff had no knowledge that the September 13 DPI report had been initiated or submitted. During those negotiations, Defendant made representations concerning confidentiality and resolution of the employment matter that were material to Plaintiff's decision to resign. Contrary to those representations, and without disclosing information material to Plaintiff's understanding of the consequences of the proposed separation, Defendant did not inform Plaintiff that it had already initiated (or submitted) a DPI licensure-misconduct process arising from the May 22 incident, that such a process remained pending and that Defendant intended to continue, or supplement that process following Plaintiff's resignation.

41. To Plaintiff's further surprise, after obtaining his resignation through the negotiated separation, Defendant submitted an additional report concerning the same May 22 incident to DPI. That document, entitled "Licensed Educator Misconduct Reporting Form," was signed on November 14, 2024 by Jerry Griffith, Senior Administrator for Employee Relations with WCPSS. See Exhibit "I".

42. The November 14 form repeated essentially the same abbreviated allegation, but by then Defendant identified Cary Police Department as the investigating agency and expressly answered "No" to the question whether Plaintiff had been formally charged with a crime. The

follow-up form again marked each listed supporting-document field "N/A". At the same time, Defendant checked a box stating that WCPSS had closed its investigation and had "included all relevant evidence and documentation within this report", and Griffith certified the information as true, accurate, and complete. The form identified November 14, 2024 as the date the final decision was issued. See Exhibit "I".

43. The November 14 report raises an additional and more concrete timing issue. N.C.G.S. § 115C-326.20(b) separately required qualifying misconduct resulting in resignation to be reported within five days of acceptance of the resignation. The executed CPA states that it was effective October 6, 2024, and that Muttillo, as Superintendent's Designee, "ACCEPTED FOR and on behalf of the Wake County Board of Education" on October 6, 2024. To the extent Defendant treated Plaintiff's resignation as a separate triggering event requiring an additional report, the November 14 submission came approximately thirty-nine calendar days after Defendant's written acceptance. Even if the clock were measured from Plaintiff's November 5 last day of employment rather than the written acceptance date, the November 14 filing still came nine calendar days later.

44. During the negotiations that resulted in Plaintiff's resignation, Defendant represented that the employment matter would be resolved confidentially through the parties' agreement. Yet Defendant did not disclose that it had already initiated or reported Plaintiff to DPI, that a licensure-misconduct process arising from the same incident remained underway, or that an additional report would be submitted after his resignation.

45. Such disclosure was significant in that Defendant obtained the benefit of Plaintiff's resignation while pursuing adverse professional licensure consequences it had already initiated

and intended to continue (at the same time advancing Defendant's favored candidate in the senate race).

46. Plaintiff further alleges, upon information and belief, that similarly situated employee matters involving comparable allegations or workplace incidents did not result in equivalent reports to DPI. In Plaintiff's experience, comparable situations had not routinely resulted in licensure referrals, further depriving him of any reasonable basis to anticipate that Defendant had secretly initiated, or would continue to pursue, a DPI proceeding arising from the May 22 incident.

47. The timing of these actions were politically motivated surrounding Plaintiff's candidacy for the North Carolina State Senate and his protected off-duty political activity. Plaintiff's suspension occurred during the active election period and in the context of a race that could allow the Democratic Party to break the Republican "supermajority" in the Senate. Additionally, having a Republican Senator from Wake County with highly specialized practical educational experience and strong academic credentials presented a problem for Defendant's leftist Democratic leadership. The first DPI report of September 13 was submitted 7 days before ballots for the 2024 General Election were beginning to be sent out to voters, without his knowledge. Defendant then negotiated and obtained Plaintiff's resignation without disclosing the existing or continuing licensure process. An additional misconduct report of November 14 followed after Plaintiff's separation from employment.

48. Plaintiff first learned of the DPI reports on September 10, 2025, well over a year after the underlying incident occurred, when DPI required him to appear before a conduct review panel of other North Carolina licensed administrators to defend himself or else his license would

be revoked. He was then employed by another school district and reasonably feared consequences to his professional license and employment.

49. Plaintiff incurred approximately $10,000 in legal fees defending the DPI matter. He did not learn that DPI had closed the matter without action until after he filed this lawsuit in July 2026 and has yet to receive any official communication clearing him. Plaintiff learned of this when DPI communicated publicly to the News & Observer in July of 2026 that the matter had been reviewed and that no action was taken against Plaintiff's educator license.

50. The undisclosed DPI proceeding left Plaintiff in professional limbo for months and caused substantial anxiety and mental-health injury.

51. Upon information and belief, Plaintiff asserts that without informing him Defendant or it's agent(s) reported the May 22 incident to the media to negatively affect his political campaign before the CPA was executed and, in fact, while it was being negotiated; thus, the confidentiality provisions agreed to by Defendant were hollow, deceptive and, in fact, false.

52. Notably, after Plaintiff's forced resignation and the DPI reports, Taylor, then-Board Chair Chris Heagarty, and then-Vice Chair (current Chair) Tyler Swanson provided written recommendations in early 2025, after each had affirmative knowledge of the May 22 incident that strongly endorsed Plaintiff's competence, leadership, and suitability for educational leadership. See Exhibits "J", "K" and "L".

53. Defendant had a duty of good faith to disclose to Plaintiff in the CPA negotiations and its execution that it would make a misconduct report against him to the DPI inasmuch as the report fundamentally undermined the purpose, spirit and letter of the CPA to resolve finally and confidentially the entire student altercation incident and to protect his reputation and future

career opportunities. Plaintiff fully relied on the good faith of Defendant not to conceal material facts during the CPA negotiations and its subsequent execution.

54. Had Plaintiff known that a DPI report already existed (or had been initiated) or that Defendant intended to make or supplement one after obtaining his resignation, Plaintiff would not have executed the CPA, resigned, or released his employment rights.

55. In short, the actions and omissions of Defendant in negotiating and entering into the CPA with Plaintiff were taken in bad faith and constituted fraudulent inducement to enter into a substantive contract warranting total rescission of the CPA.

56. Additionally, and of great significance, Plaintiff both during and before his time at Connections Academy as a concerned citizen, documented extensive school safety issues and made them available to Wake County School officials, the Wake County Sheriff, and multiple Wake County Commissioners, regarding both the increasing incidence of dangerous student behavior but also the absence of sufficient safety measures at the schools to address persistent violence and safety hazards involving acknowledged troubled students. In fact, for years Lassiter vigorously advocated for School Resource Officers, metal detectors and other security support devices. During Plaintiff's time as an elected Councilman for the Town of Apex, he introduced a proposal and secured council support for a measure to fund additional School Resource Officers in the WCPSS Schools in the municipal limits. Once at Connections Academy, Plaintiff's multiple documented formal complaints and suggested remedies about the ongoing threats to public health and safety fell on deaf ears and blind eyes notwithstanding Defendant's full knowledge of the merits of Lassiter's concerns, which were fully documented and reported.

57. Leonor Both, a WCPSS employee from 2015 through 2026 who worked at Connections Academy with Plaintiff for many years, has provided a sworn affidavit based upon

her personal knowledge and observations. Both describes Connections Academy as an unusually challenging school environment serving students with serious behavioral and safety concerns, including violence, fighting, threats, criminal or juvenile-justice involvement, gang involvement or associations, drug activity, and threats involving firearms. She further states that Connections Academy did not have a regularly assigned School Resource Officer during the period she worked with Plaintiff and that, as a practical matter, administrators and other school employees were required to serve as the immediate responders when serious safety incidents occurred. Both personally observed Plaintiff move toward dangerous situations when others were attempting to get away, place himself between aggressive or fighting students and other people, and repeatedly assume personal risk when another person needed assistance. She came to regard Plaintiff as one of the administrators she wanted present when a serious student-safety situation developed and states that she never personally witnessed him deliberately injure a student because he was angry, seek out a physical confrontation with a student, or use physical force for the purpose of punishing a student. Based upon her firsthand experience, she regarded Plaintiff as unusually willing to assume personal risk to protect students and employees. Both also personally witnessed the beginning of the May 22 incident and states that the confrontation was already underway before Plaintiff became involved, that the student was engaged in an escalating conflict, and that, based upon what Both personally observed, the situation presented a legitimate safety concern requiring intervention. See Exhibit "M".

58. Both swore that Plaintiff's Republican political identity, candidacy, and public political activities were known within WCPSS and that she personally became aware of discussion and attention concerning his political activities and public profile. Based upon her own observations, Both became concerned that Plaintiff's political identity caused him to receive

a type or degree of scrutiny that she did not observe being directed toward employees whose political views were more consistent with the prevailing culture of WCPSS. Both specifically emphasizes that she was not politically aligned with Plaintiff and that her own views were generally much closer to the Democratic or liberal viewpoints she encountered within WCPSS. She nevertheless believed Plaintiff should have been evaluated on his work and conduct rather than his political identity or public activities. Both further swore that Plaintiff's treatment following May 22 did not square with either the administrator she had personally observed or the difficult safety environment in which they worked, that she believed Plaintiff was treated unusually harshly, and that the circumstances caused her to question whether WCPSS's response was based solely upon the student incident. Based upon her own observations and experiences, Both ultimately came to believe that Plaintiff's politics influenced the unusually harsh and disparate treatment that was administered to him by Defendant. See Exhibit "M".

59. Plaintiff consistently and passionately asserted that some WCPSS schools were becoming "dumping grounds" for the area's unmotivated, troubled, and violent children with no real strategy to improve their lot. Plaintiff consistently criticized what he believed were inadequate WCPSS responses to serious student behavior and insufficient safety resources for staff and students. As reflected above, he advocated for and presented viable options for safety, including School Resource Officers, metal detectors and weapons-detection technology, and additional support for schools serving students with significant behavioral needs. Those concerns became a central part of his public campaign for the State Senate and his broader criticism of Defendant's education and safety policies.

60. Plaintiff's public statements during the 2024 campaign concerning school safety, student discipline, educational policy, and Defendant's performance were made in his capacity as

a citizen and candidate for public office, not pursuant to his official duties as an assistant principal. Those statements addressed matters of public concern and did not prevent Plaintiff from performing his job duties effectively. Connections Academy nevertheless produced meaningful educational and behavioral successes for many of the students entrusted to it. Plaintiff's criticism was not directed at those students or at the mission of alternative education. Rather, Plaintiff believed that students with significant behavioral needs, their classmates, and the educators serving them were all entitled to a properly staffed and adequately secured educational environment. Plaintiff's documented performance evaluations and the firsthand accounts described herein reflect that he remained committed to that mission while repeatedly advocating for greater safety resources.

61. Defendant's handling of licensed-employee physical-contact, restraint, student-safety, discipline, and reporting matters has not been remotely uniform. N.C.G.S. § 115C-326.20(b) and the implementing licensure-reporting rules required timely reporting when qualifying misconduct resulted in specified employment action. Defendant nevertheless has been totally inconsistent over how allegations were characterized, investigated, disciplined, resolved, communicated publicly, and reported. Plaintiff alleges that Defendant exercised its authority materially differently in his case and that the timing and severity of its actions were in response to his protected safety advocacy and off-duty political candidacy. The vacillating policy of Defendant regarding the mandatory and timely reporting of alleged cases of misconduct to the DPI [N.C.G.S. § 115C-326.20(b)] consisted of sometimes reporting, sometimes not reporting and sometimes delaying reporting. In short, Defendant, acting under color of state law, adopted and embraced nothing more than a fast and loose policy in reporting claims of employee misconduct. In the instant case, Defendant's decisions suspending Plaintiff and thereafter

delaying the report to the DPI constituted First Amendment retaliation against Lassiter for his ardent safety advocacy and, more importantly, his political campaign, actionable under 42 U.S.C. § 1983 and Article I, Sections 14 and 19 of the North Carolina Constitution inasmuch as off-duty political activity is protected speech, protected against arbitrary and capricious governmental acts depriving a person of fundamental constitutional rights under the Fourteenth Amendment Due Process Clause.

62. The clearest example of the inconsistency referred to in the preceding paragraph is that of BST Dickerson because he participated in the same May 22 incident, involving the same student, at the same time and place. Dickerson initiated physical contact and tackled the threatening student, was suspended with pay, and was returned to duty immediately after Plaintiff resigned without further discipline. See Exhibit "D". Plaintiff, by contrast, was threatened with a public termination recommendation, pressured to resign, subjected to a delayed DPI process, and suffered continuing reputational and employment consequences including Defendant's statements in the media calling Plaintiff's integrity into question.

63. Other examples of substantially different institutional responses to serious allegations of physical conduct involving students abound. At East Wake High School, multiple employees reported in 2022 that teacher James Rencher had physically assaulted students with disabilities. Rather than immediately removing Rencher from WCPSS employment, Defendant permitted him to transfer in November 2022 to Herbert Akins Road Middle School, where additional alleged physical misconduct involving students with disabilities was reported. Within approximately one month of his transfer, an educator reportedly witnessed Rencher grab a student by the wrist and drag her approximately twenty feet while the student repeatedly stated that she was being hurt, and the incident was reported to the Herbert Akins principal. Another

alleged physical incident involving a student was reported during the following school year. Rencher nevertheless remained employed at Herbert Akins until April 2024. WRAL subsequently reported that 602 days elapsed between the first reported assault and WCPSS's notification of law enforcement. Rencher was later convicted of assaulting students with disabilities arising from the East Wake incidents.

64. After WCPSS investigated the East Wake matter, Principal Stacey Alston was not separated from WCPSS employment. He received a ten-day unpaid suspension, was removed from the principalship, and was reassigned to a central-office administrative position and maintained his same salary.

65. In another publicly reported matter at Panther Creek High School, video appeared to show Assistant Principal Jonathan Chang restraining a student during a fight with his knee on or near the student's neck. Defendant suspended Chang with pay while law enforcement investigated; Cary police later announced that no criminal charges were pending, and WCPSS materials subsequently continued to identify Chang as an employee. The Chang case demonstrates that physical restraint allegations did not invariably result in forced separation or career-ending treatment. Instead, he was transferred to central office, retained his salary, and he remained employed until his contract expired.

66. Likewise, public video from a large 2018 Athens Drive High School parking-lot brawl appears to show then-Principal Stephen Mares entering the melee and using physical force while attempting to separate fighting students. One student was hospitalized, police and EMS responded, and Mares publicly described staff intervention as part of restoring safety. Defendant did not treat Mares's intervention as career-ending misconduct; he remained principal for years

after the incident and upon retirement was invited back to serve in various interim principal and assistant principal capacities.

67. The meritless suspension and delayed report to the DPI after months of governmental inactivity constituted no more than an unconstitutional vehicle to undermine Plaintiff's political campaign by Defendant and its agents opposed to his views and party affiliation in the critical, waning days of the campaign. Additionally, the suspension and delayed report were retaliatory in nature for Plaintiff's steady stream of political and non-political criticism aimed at Defendant and its agents, for their failure to address school safety concerns. As such, Defendant, acting under state law [N.C.G.S. § 115C-326.20(b)] infringed upon Plaintiff's First Amendment and state Constitutional rights as set forth above.

68. The challenged actions were undertaken through Defendant's official personnel and licensed-educator reporting processes and by officials exercising authority delegated by Defendant. Defendant authorized and accepted the CPA, Plaintiff's resignation, and the benefits of his release, and approved or ratified the challenged course of conduct

69. While the mandatory DPI reporting of certain misconduct was generally known by WCPSS employees it was, in the main, considered discretionary and not uniformly enforced, as alleged herein.

70. The Wake County Board of Education possessed final policymaking authority under North Carolina law over the employment, separation, and personnel policies at issue. Second, the Board, by policy, practice, or specific authorization, delegated final authority concerning the acceptance of Plaintiff's resignation and implementation of the associated personnel and reporting decisions to the Superintendent and designated senior officials. Third, the Board or its authorized designees approved or ratified the challenged course of conduct and retained the

benefits of Plaintiff's resignation and release with knowledge of the material circumstances alleged herein.

## FIRST CAUSE OF ACTION

### Fraudulent Inducement

71. Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

72. Defendant knew that Plaintiff was anxious to resolve the student altercation matter for several reasons including but not limited to his political race and to move on with no further damage to his reputation and his career opportunities in public education.

73. Defendant also knew that it was of the utmost importance to Plaintiff that the student altercation matter and its mutually agreed upon resolution be kept totally confidential in nature after the initial reporting of the matter to law enforcement and others.

74. Defendant knew, as well, that Plaintiff would not resign from his employment with the school system and enter into a separation agreement if Defendant was going to report the student altercation matter to other third parties including the DPI and the media.

75. Accordingly, Defendant intentionally failed to disclose during the CPA negotiations that it had initiated, intended to initiate, or intended to continue a DPI licensure-reporting process arising from the same student incident, while simultaneously obtaining Plaintiff's resignation and release on the representation that the employment matter would be over and confidential to the extent represented in the CPA.

76. Defendant intended Plaintiff to rely on the representation and omission by resigning and releasing claims, and Plaintiff reasonably did so. Neither Plaintiff nor his two attorneys knew the concealed reporting facts.

77. The concealed fact was not merely a promise about future conduct. By the time the parties executed the CPA on October 6, Defendant had already submitted the September DPI report. The existence of that report, the fact that it opened or continued a separate licensure-misconduct process, and Defendant's knowledge of its own reporting decision were existing facts peculiarly within Defendant's knowledge. Plaintiff and the two attorneys advising him did not know those facts. Plaintiff alleges that Hill's representation that resignation would mean the matter was over, coupled with Defendant's silence about an already-filed report, created a materially false understanding of what resignation would accomplish.

78. Defendant sought and obtained Plaintiff's resignation and broad release while withholding that it had already invoked the DPI licensure process and while failing to disclose that the process would remain active or be supplemented after the Agreement. The CPA's general statement that nothing impaired Defendant from complying with legal obligations was satisfied but, in fact, may have been violated by Defendant itself in its exercise.

79. Plaintiff has suffered damages that were proximately caused by Defendant's omission, as set forth herein, including significant pecuniary loss, reputational injury and limited career opportunities. Plaintiff is additionally entitled to rescission of the CPA.

80. Defendant had a duty to disclose the existing material fact (an already completed and submitted DPI report) while recognizing that knowledge of this fact would have caused Plaintiff to reject the CPA and its included resignation.

81. Plaintiff's reliance on representations of Defendant's agents underpinning the CPA was reasonable under a good faith analysis. Had the truth been disclosed, Plaintiff would not have executed the CPA and would have invoked the available procedures to contest dismissal and protect his professional license and reputation at that time.

82. Based upon the material omissions and his reliance thereon Plaintiff sustained career ending consequences as well as reputational injury, emotional injury, monetary, punitive and compensatory damages as set forth herein.

83. Plaintiff's WCPSS compensation was approximately $90,000 annually. He later accepted an assistant principal position in Harnett County Schools paying approximately $65,000 a year and suffered related wage, benefit, and retirement losses.

84. The City of Raleigh retracted an employment offer for a management position exceeding $80,000 annually, citing "negative publicly available information" and "insufficient references."

85. Plaintiff also suffered DPI-defense expenses (approximately $10,000), therapy expenses, serious reputational and emotional injury, and diminished advancement opportunities despite earning his doctorate and superintendent's license while employed by WCPSS.

86. From approximately December 2024 through August 2025, Plaintiff applied for nearly one-hundred WCPSS teaching, assistant-principal, and auxiliary-services positions for which he was qualified. Despite his prior WCPSS administrative experience, doctorate-level training, superintendent licensure, and written endorsements from senior WCPSS leaders, he received only two teacher interviews and one assistant-principal interview and no offer of employment. As an example of him being "black balled" by the WCPSS, when Plaintiff applied for a position at Zebulon Middle School, he was informed by the Assistant Principal that the Principal advised him that Plaintiff was ineligible to be hired.

## SECOND CAUSE OF ACTION

## First Amendment Retaliation Under 42 U.S.C. § 1983 and Related State Constitutional Claims

87. Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

88. Defendant, acting under color of state law, as described and alleged above, deprived Plaintiff of rights secured by the First and Fourteenth Amendments to the United States Constitution actionable under 42 U.S.C. Section 1983.

89. The Supreme Court has long recognized that government may not deny a benefit on a basis that infringes constitutionally protected interests in speech and association, thereby producing indirectly a result it could not command directly. The First Amendment likewise is not a tenure guarantee, but it prevents government absent the constitutionally required justification, from wielding public-employment authority to interfere with employees' freedom to believe and associate. Plaintiff alleges that Defendant exercise its employment and licensure-reporting authority for precisely the impermissible retaliatory reasons alleged herein.

90. Defendant's liability does not rest upon respondeat superior. Rather, North Carolina law places general control and supervision of the local public-school system in the local board of education. See N.C. Gen. Stat. §§ 115C-36, 115C-40. North Carolina law further provides that local boards make policy decisions, including employment decisions, and adopt policies governing employee conduct, see N.C. Gen. Stat. § 115C-47(1), (18); that appeals concerning the terms, conditions, or status of a school employee's employment lie to the local board, see N.C. Gen. Stat. § 115C-45(c)(3); and that the superintendent is bound by lawful acts of the Board and charged with carrying out its rules and regulations, see N.C. Gen. Stat. § 115C-276(a). Consistent with this statutory structure, federal courts applying North Carolina law have recognized that a local school board is the final policymaker concerning employment and

discharge of school employees and that North Carolina vests final policy authority for the local school district in the Board.

91. Municipal action also may arise where final policymaking authority concerning a particular matter has been delegated to subordinate officials through law, Board policy, or established practice. It has long been recognized that superintendents and principals act as agents of their boards in carrying out assigned responsibilities and that a board cannot avoid responsibility for its own action merely because it acted upon recommendations supplied through those agents.

92. In short, Defendant abused the authority conferred, and the duty imposed, by N.C.G.S. § 115C-326.20(b) by weaponizing the mandatory misconduct-reporting requirement for an impermissible retaliatory purpose: to punish Plaintiff for, and interfere with, his protected off-duty political speech, political association, candidacy for the North Carolina State Senate, and citizen speech on school safety and public education. By suspending Plaintiff and reporting him to the State Board of Education, not as the neutral and good-faith application of a mandatory reporting statute but, as alleged herein, for the purpose of damaging his political campaign and retaliating against protected activity, Defendant violated Plaintiff's rights under the First Amendment. Plaintiff further alleges, that under North Carolina law and in the alternative, that the same selective and allegedly viewpoint-based use of governmental authority violated the free-speech and law-of-the-land/equal-protection guarantees of Article I, Sections 14 and 19 of the North Carolina Constitution.

## **THIRD CAUSE OF ACTION**

### **Fourteenth Amendment Procedural Due Process Under 42 U.S.C. § 1983 – Deprivation of Protected Property Interest in Existing Employment**

93. Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

94. At the time of the events described above, Plaintiff was employed pursuant to an existing written school-administrator employment term extending through June 30, 2025. N.C. Gen. Stat. § 115C-287.1(c) provides that a school administrator shall not be dismissed or demoted during the term of the contract except for the grounds and by the procedure prescribed by law. Plaintiff alleges that his written contract and applicable North Carolina law afforded him a legitimate claim of entitlement to continued employment during the unexpired contractual term except as otherwise permitted by law.

95. That legitimate claim of entitlement constituted a property interest protected by the Due Process Clause of the Fourteenth Amendment.

96. Although Plaintiff's separation was characterized as a resignation, Plaintiff alleges that it was not genuinely voluntary. He was presented with the choice of resigning or facing a threatened public recommendation for termination under the circumstances described above, including during an active political campaign and after senior officials had communicated that his political candidacy and continued WCPSS employment were incompatible.

97. A public employer may not avoid its constitutional obligation to provide due process by forcing an involuntary resignation. An apparent resignation may constitute a deprivation of a protected status when obtained through the employer's material misrepresentation or deception or through duress or coercion, including where the employee is prevented from making a free and informed choice concerning the consequences of resignation or the alternative to resignation.

98. Plaintiff alleges that Defendant thereby accomplished the premature termination of his existing employment relationship approximately eight months before expiration of his

contractual term without affording him constitutionally adequate notice and a meaningful opportunity to contest the involuntary deprivation of his protected employment interest.

99. As a direct and proximate result, Plaintiff lost compensation, benefits, and other incidents of the remainder of his contractual employment and suffered the additional injuries alleged herein. Defendant thereby deprived Plaintiff of property without due process of law in violation of the Fourteenth Amendment, actionable pursuant to 42 U.S.C. § 1983.

100. An apparent resignation may constitute a deprivation of protected status when obtained through material misrepresentation, deception, duress, or coercion. Plaintiff alleges both coercion and material deception: a threatened public termination recommendation under severe temporal and reputational pressure, coupled with concealment of an already-filed DPI report and continuation of a separate licensure process.

101. Plaintiff lacked a meaningful alternative because Defendant presented resignation as the means to end the matter privately while threatening a public termination process during the closing weeks of his campaign and withholding information essential to an informed choice. The short decision period, Defendant's superior knowledge, the direct pressure by a senior Employee Relations official, the threatened consequences, and Defendant's concealment of the existing report together plausibly establish an involuntary resignation.

## FOURTH CAUSE OF ACTION

### Fourteenth Amendment Procedural Due Process Under 42 U.S.C. § 1983 – Deprivation of Occupational Liberty Interest and Denial of Name-Clearing Process

102. Plaintiff realleges and incorporates the preceding paragraphs as if fully set forth herein.

103. In connection with Plaintiff's separation from WCPSS, Defendant made, maintained, and communicated allegations concerning Plaintiff's professional conduct that Plaintiff alleges

were false or materially misleading and sufficiently stigmatizing to call into question his professional fitness and integrity. Those allegations were directly connected to the circumstances culminating in Plaintiff's resignation, which Plaintiff alleges was involuntary for the reasons stated herein.

104. The Fourteenth Amendment protects a public employee's occupational liberty interest when false and stigmatizing charges are made public, or are made likely to be disseminated to prospective employers, in connection with termination or an equivalent adverse employment action without a meaningful opportunity to clear the employee's name.

105. Procedural due process protects a public employee’s liberty interest in reputation and choice of occupation when governmental action imposes a stigmatizing employment consequence without an adequate opportunity to be heard. Plaintiff alleges not merely the theoretical existence of adverse information but circumstance making its dissemination to prospective employers’ likely and professional consequences flowing from the challenged information.

106. The likelihood of dissemination here was substantial. Defendant communicated allegations concerning Plaintiff's professional conduct outside the immediate employment decision-making process through official reports to the DPI. WCPSS further instructed Plaintiff's former principal not to provide Plaintiff a professional reference and instead to direct reference inquiries to WCPSS Human Resources. Plaintiff thereafter applied to numerous WCPSS and other public-sector positions for which professional references and employment-history inquiries were reasonably foreseeable and customary.

107. Plaintiff alleges that these circumstances created substantially more than a theoretical possibility that prospective employers or members of the public would encounter the

stigmatizing information maintained or communicated by Defendant. Plaintiff subsequently experienced substantial difficulty obtaining employment for which he was qualified, including repeated unsuccessful efforts to return to WCPSS and the withdrawal of another governmental employment opportunity following concerns identified to Plaintiff as involving negative publicly available information and insufficient references.

108. Plaintiff disputes the materially stigmatizing allegations concerning his professional fitness and alleges that Defendant never afforded him a meaningful name-clearing hearing at which he could challenge false or materially misleading charges associated with his separation.

109. The challenged deprivation was undertaken through the official personnel, communications, and licensure-reporting machinery and municipal action alleged above. Plaintiff incorporates the municipal-liability allegations set forth in the Second Cause of Action.

110. Defendant's failure to provide Plaintiff a meaningful opportunity to clear his name deprived Plaintiff of liberty without due process of law in violation of the Fourteenth Amendment, actionable pursuant to 42 U.S.C. § 1983. As a direct and proximate result, Plaintiff suffered loss of employment opportunities, impairment of professional reputation and occupational liberty, lost income, and the other damages alleged herein.

111. The stigmatizing charges included Defendant’s official characterization that Plaintiff pushed a student out of a building door causing the student to fall and threw the student’s shoe in the student’s direction, together with the characterization that his resignation occurred during or immediately following an investigation of professional misconduct. Plaintiff alleges those statements were false or materially misleading because they omitted the student’s sustained aggression, the threat to another student, the staff safety response, the accidental nature of the fall

described by Dickerson, the complete video context, corroborating witnesses, and the absence of criminal charges.

112. The charges were sufficiently serious to imply dishonesty, deliberate mistreatment of a student, abuse of professional authority, and unfitness for educational employment. They were made in the course of and in connection with Plaintiff's compelled separation and were communicated to DPI through official reports, maintained in channels foreseeably consulted in educator licensing and hiring, and made likely to be disseminated to prospective public-school employers through Defendant's centralized reference process.

113. Plaintiff has never received a hearing directed to clearing his name before an impartial decisionmaker with notice of the stigmatizing charges and a meaningful opportunity to present the full video, witnesses, comparator evidence, and other exculpatory material. A separate investigation or the opportunity to submit an employment statement did not supply the constitutionally required opportunity for public vindication after dissemination of the charges.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the Court as follows:

a. Declare the Confidential Personnel Agreement void and of no effect and rescinded; and
b. Restore Plaintiff to his prior position with Defendant or a comparable position; and
c. Award Plaintiff compensatory damages, including but not limited to back pay, front pay, fringe benefits and other damages proven at trial; and
d. Award Plaintiff punitive damages as allowed by law; and
e. Award Plaintiff costs and expenses incurred in this action, including all legal and attorney's fees pursuant to 42 U.S.C. § 1988; and
f. Award Plaintiff pre and post judgment interest on compensatory damages; and

g. All such further relief, both general and special, at law or in equity, to which Plaintiff may show himself justly to be entitled or as the court may deem appropriate.

h. Declare that Defendant's retaliatory and procedurally deficient conduct violated Plaintiff's rights under the First and Fourteenth Amendments; and

i. Enjoin Defendant from maintaining or communicating materially false or misleading stigmatizing characterizations concerning Plaintiff; and

j. Grant rescission, restitution, reformation, or other alternative relief concerning the CPA as proven, without requiring inconsistent remedies to be elected before the time required by law.

Respectfully submitted this the 28th day of September 2026.

**EDMISTEN & WEBB LAW**

*/s/ William Woodward Webb*
William Woodward Webb
NC State Bar #4624
118 St. Mary's Street
2nd Floor
Raleigh NC 27605
woodywebb@ew-law.com
(919) 831-8700

## CERTIFICATE OF SERVICE

The undersigned attorney has this date served the foregoing First Amended Complaint upon the following parties via the CM/ECF System of the United States District Court for the Eastern District of North Carolina:

Colin A. Shive
cshive@tharringtonsmith.com
THARRINGTON SMITH, LLP
150 Fayetteville Street
Suite 1900
P.O. Box 1151
Raleigh, NC 27602

This the 28th day of September 2026.

**EDMISTEN & WEBB LAW**

*/s/ William Woodward Webb*
William Woodward Webb
NC State Bar #4624
118 St. Mary's Street
2nd Floor
Raleigh NC 27605
woodywebb@ew-law.com
(919) 831-8700