STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
Case No. 26CV013619-910

| | | |
|---|---|---|
| SCOTT LASSITER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **AFFIDAVIT OF LEONOR BOTH** |
| | ) | |
| WAKE COUNTY BOARD OF EDUCATION, | ) | |
| | ) | |
| Defendant. | ) | |

I, Leonor Both, being first duly sworn, depose and state as follows:

**Background and Basis of Knowledge**

**1.** I am over the age of eighteen and competent to testify to the matters contained in this affidavit. The statements below are based upon my personal knowledge, observations, and experiences while employed by the Wake County Public School System ("WCPSS").

**2.** I worked within the Wake County Public School System during the period of 2015 - 2026. I worked at Connections Academy Middle School during the period when Dr. Scott Lassiter served as an assistant principal. I worked with him closely enough to observe his interactions with students and staff and his responses to disciplinary, behavioral, and safety situations.

**3.** Unless otherwise indicated, I am describing matters I personally observed or matters of which I had direct knowledge through my work responsibilities. I understand that this affidavit may be used in litigation involving Dr. Lassiter and WCPSS.

**Connections Academy and the Safety Environment**

**4.** Connections Academy was an unusually challenging school environment. The school served students who had experienced significant disciplinary, behavioral, educational, and other difficulties in traditional school settings.

**5.** During my employment there, I personally encountered students presenting extremely serious behavioral and safety concerns. The student population included students with histories of violence, fighting, threats, criminal or juvenile-justice involvement, serious behavioral or mental-health needs, gang involvement or associations, drug activity, and other conduct that created significant challenges for school personnel.

**6.** Weapons were also a genuine safety concern. During my experience at Connections Academy, I did not have any experience with students bringing guns into the school, however, I was aware of students often threatening to bring guns to school. In addition, if there were student acts of criminal misconduct, administration would not disclose any information to teachers, thus decreasing our ability to make informed decisions regarding our own safety.

Exhibit
M

**7.** Despite the nature of the student population and the seriousness of the safety issues, Connections Academy did not have a School Resource Officer regularly assigned and present during the period that I worked with Dr. Lassiter.

**8.** As a practical matter, administrators and other school employees therefore served as the immediate responders and were required to make rapid decisions concerning student and employee safety.

**My Firsthand Observations of Dr. Lassiter**

**9.** I personally observed Dr. Lassiter assume this immediate-response responsibility on many occasions.

**10.** I had numerous opportunities to observe him deal with angry, defiant, disruptive, threatening, and aggressive students.

**11.** I saw him move toward dangerous situations when others were attempting to get away from them. I saw him place himself between aggressive or fighting students and other people.

**12.** This occurred often enough that I came to regard Dr. Lassiter as one of the people I wanted present when a serious student safety situation developed.

**13.** Despite those experiences, I never personally witnessed Dr. Lassiter deliberately injure a student because he was angry, seek out a physical confrontation with a student, or use physical force for the purpose of punishing a student.

**14.** My experience was essentially the opposite. I repeatedly observed Dr. Lassiter put himself at risk when another person needed assistance.

**15.** Based upon my firsthand experience, I regarded Dr. Lassiter as an administrator who was unusually willing to assume personal risk in order to protect students and employees.

**16.** Dr. Lassiter was licensed to drive a school bus. This allowed a second bus for agitated students to take to their connecting buses, decreasing assaults and volatile activity on the bus. In addition, his bus license was instrumental in taking students on field trips and activities they would otherwise have never experienced.

**17.** Dr. Lassiter established a monetary fund to encourage students to work by paying them for work that could be substantiated (mowing lawns, cleaning, assisting the elderly, etc.).

**18.** Dr. Lassiter brought inspirational speakers (i.e. officers of the military, police officers) to the school to encourage students to make better decisions for their futures.

**19.** Dr. Lassiter supported his teachers at all times, giving teachers the confidence they needed to report students, incidents or suspicious activities without fear of reprisal.

**May 22, 2024 Incident**

**20.** I personally witnessed the beginning of the student incident involving Dr. Lassiter on May 22, 2024.

**21.** The confrontation I witnessed did not begin with Dr. Lassiter. Before he became involved, the student was already engaged in an escalating conflict. The student in question was a student that came back to school after a long-term suspension that resulted from a bus incident at Connections Academy in which she violently assaulted another student. On her first day back the

student in question stated she would "beat up" the first person that made fun of the pornographic social media content she had posted. By mid-morning, many students had commented on the post.

**22.** Based upon what I personally observed, I believed the situation presented a legitimate safety concern and required intervention.

**23.** Dr. Lassiter entered a situation that was already underway.

### The Absence of a Regular SRO

**24.** The absence of a regularly present School Resource Officer is important context for understanding the environment in which administrators such as Dr. Lassiter worked.

**25.** There was not ordinarily a law-enforcement officer immediately available in the building to take over when a serious student incident developed.

**26.** Administrators had to make immediate decisions about student and employee safety. Dr. Lassiter was one of the administrators I personally saw perform that function repeatedly.

**27.** In practical terms, he provided an important measure of immediate safety response in a school that did not have a regularly present SRO.

### Conditions Following Dr. Lassiter's Departure

**28.** I remained familiar with conditions at Connections Academy after Dr. Lassiter was no longer working there.

**29.** The serious behavioral and safety problems at the school did not disappear with his departure; in fact, they were worse. I personally observed significant disorder and serious student misconduct after he was gone.

**30.** This included fighting, aggressive behavior, major disruptions, and other incidents requiring substantial intervention by school personnel.

**31.** I personally observed law-enforcement officers respond to Connections Academy on multiple occasions after Dr. Lassiter's departure.

**32.** Based upon my personal experience before and after Dr. Lassiter's departure, I believed the school experienced substantial worsening problems with order, student behavior, and safety after he was gone.

**33.** I was aware that Dr. Lassiter had publicly raised concerns about the lack of a regularly assigned SRO at Connections Academy.

### Political Background and the Political Climate

**34.** Dr. Lassiter's Republican political identity, candidacy, and public political activities were known within the school system, and I personally became aware of discussion and attention concerning his political activities and public profile.

**35.** Based upon my observations, I became concerned that Dr. Lassiter's political identity caused him to receive a type or degree of scrutiny that I did not observe being directed toward employees whose political views were more consistent with the prevailing culture.

**36.** This was noticeable to me precisely because I was not politically aligned with Dr. Lassiter. I generally shared political views much closer to the Democratic or liberal viewpoints I encountered within WCPSS.

**37.** I nevertheless believed Dr. Lassiter should have been evaluated on his work and conduct rather than on his political identity or public activities.

**My Concerns About Dr. Lassiter's Treatment**

**38.** I was troubled by the manner in which Dr. Lassiter was treated following the May 22 incident.

**39.** The treatment of Dr. Lassiter following May 22 therefore did not square, in my view, with either the administrator I had personally observed or the difficult safety environment in which we actually worked.

**40.** I believed he was treated unusually harshly.

**41.** Given what I personally observed concerning the political environment, the attention paid to Dr. Lassiter's political activities, and the manner in which he was treated, I became concerned that factors beyond the May 22 student incident were influencing how he was being viewed.

**42.** I cannot testify to another person's private thoughts or motives. I can testify that Dr. Lassiter's political identity was known, that I observed attention surrounding his political activities, that I personally witnessed the circumstances preceding his intervention on May 22, and that I subsequently observed the manner in which he was treated.

**43.** Taken together, those circumstances caused me to question whether the response to May 22 was based solely upon the student incident itself.

**44.** Based upon my own observations and experiences, I believed that Dr. Lassiter's political identity and public political activities may have played a role in the unusually harsh treatment he received.

**45.** The statements contained herein are true and accurate to the best of my personal knowledge and recollection.

Further affiant sayeth not.

Leonor D. Both

Leonor Both

Sworn to and subscribed before me this 4th day of September, 2026.

Jayden A. G.

Notary Public

My Commission Expires: 6/14/2031

JAYDEN A GARNER NOTARY PUBLIC DURHAM COUNTY, NC